Gustavo Magaña (SBN 305970)
The Law Office of Gustavo Magaña
4701 Patrick Henry Dr. Bldg 16 Suite 15F
Santa Clara, CA 95054
T: (408) 430-0411
F: (800) 650-9326
E: Gmaganaesq@gmail.com

Attorney for Plaintiff
Joseph Best

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Jose Division)

| | |
|---|---|
| JOSEPH BEST,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF SAN JOSE, KEVIN VALADEZ in his individual and official capacity, and DOES 1-10, inclusive,<br><br>Defendants. | Case No.<br><br><br>COMPLAINT FOR VIOLATION OF CIVIL RIGHTS<br><br>JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1.      This case arises from the San Jose Police Department's unlawful motor vehicle stop and seizure of Joseph Best. On 6/20/2022, Mr. Best was pulled over by San Jose Police Department Officer Kevin Valadez and his DOE partner in San Jose, CA, near the intersection of Foxworthy and Meridian.

2.      Officer Valadez stopped Mr. Best without probable cause or reasonable suspicion.

3.      Officer Valadez stopped Mr. Best solely based on his race, specifically for being Latinx.

4.      Mr. Best's car windows were also all rolled down at the time of the stop, which made him visible to Officer Valadez and others.

5.      Officer Valadez claimed the probable cause for pulling him over was that his license plate light was out.

6.      Mr. Best's license plate light was not out at the time of the stop.

7.      Upon information and belief, Officer Valadez and his DOE partner had previously pulled over Mr. Best while he was in a vehicle roughly six months before the subject incident on the alleged probable cause of a license plate light out on that date as well.

8.      Officer Valadez and his DOE partner began to harass Mr. Best and demanded that he exit the vehicle to get his citation.

9.      Upon exiting the vehicle, Officer Valadez and his DOE partner began to violently push, jostle, and strike Mr. Best. Further, Mr. Best was also tased in the attack.

10.     Mr. Best was shocked, terrified, and concerned for his safety as he was being viciously attacked.

11.     Mr. Best cried out in pain, and at no time did Mr. Best strike either officer or attempt to strike either officer.

12.    Upon information and belief, more officers arrived at the scene shortly thereafter and assisted in arresting Mr. Best.

13.    Mr. Best was then transported to the hospital for emergency treatment.

14.    As a result of the excessive force by Officer Valadez and his DOE partner, Mr. Best suffered severe physical injury, including but not limited to a taser injury, contusions, and breaking a metal screw in his leg. Mr. Best also suffered from emotional distress.

15.    Mr. Best now seeks damages for the violations of his rights under the Fourth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, the California Constitution, and State law.

## JURISDICTION

16.    The claims alleged herein arise pursuant to 42 U.S.C. § 1983, §1981, the Fourth Amendment, and the Fourteenth Amendment to the United States Constitution.

17.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

## VENUE

18.    Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because the unlawful acts, practices, and omissions giving rise to Plaintiff's claims occurred in the County of Santa Clara, which is within this judicial district.

19.    On December 20, 2022, Mr. Best timely filed an administrative tort claim with the City of San Jose. Subsequently, the City of San Jose issued a notice rejecting his claims on January 19, 2022. Mr. Best has exhausted all available administrative remedies. Cal. Gov't. Code §§ 913, 945.6(a)(1).

## PARTIES

20.     Plaintiff, Mr. Best, is a resident of the City of Santa Cruz.

21.     Defendant CITY of San Jose (hereinafter "CITY") is a political subdivision organized under the laws of California and a proper defendant in this action as to Mr. Best's claims made pursuant to the California Tort Claims Act, Cal. Gov't Code §§ 810-996. Defendant CITY was at all relevant times the employer of Defendant Kevin Valadez. The San Jose Police Department is a department of the Defendant CITY. Upon information and belief, the CITY, through the San Jose Police Department, maintains an unlawful policy, custom, or practice of performing unlawful detentions, unreasonable and warrantless searches, seizures, using excessive force, and racial profiling. This unlawful policy, custom, or practice is reinforced by the San Jose Police Department's supervision and, on information and belief, through its training.

22.     At all times mentioned herein, Defendant Kevin Valadez (hereinafter "VALADEZ") was employed as an officer for Defendant CITY.  Defendant VALADEZ is sued individually and as a police officer for Defendant CITY.  By engaging in the conduct described below, Defendant VALADEZ acted under the color of law and in the course and scope of his employment for Defendant CITY.  By engaging in the conduct described here, Defendant VALADEZ exceeded the authority vested in him as an officer under the United States Constitution and as an employee of the CITY.

23.     Defendant CITY is liable for Plaintiff's injuries under California law and under the doctrine of respondeat superior. Liability under California law for public entities and public employees is based upon California Government Code §§815.2, 820, and 820.8.

# STATEMENT OF FACTS

24.    On June 20, 2022, Mr. Best was driving in San Jose and was working for a food delivery service with all of his windows rolled down and with his face fully visible to those outside his vehicle in other cars or on the street nearby.

25.    Thereafter, Defendant Valadez activated his sirens and lights to pull Mr. Best over.

26.    Mr. Best promptly complied with the order to pull over.

27.    Officer Valadez and his DOE partner then approached the vehicle. Defendant Valadez claimed that they had probable cause to stop Mr. Best because his license plate light was allegedly out.

28.    Mr. Best explicitly denies that his license plate light was out at the time of the stop.

29.    Officer Valadez's claim that Mr. Best's license plate light was out was a false statement and was being used to cover that Mr. Best was pulled over because he was a Latinx driver and Defendant Valadez racially profiled Mr. Best.

30.    Further, upon information and belief, Mr. Best had already been subjected to a similar stop on allegations that the license plate light was out at the hands of Defendant Valadez roughly six months before.

31.    In the instant case, Mr. Best was asked if he and his Latinx passenger were gang members and why they were out so late.

32.    Mr. Best and his Latinx passenger were not and are not gang members.

33.    Mr. Best also complied with Defendant Valadez's requests for his license and insurance.

34.     Thereafter, Officer Valadez accused Mr. Best of buying a fake license from the Tropicana.

35.     The Tropicana refers to the plaza in Eastside San Jose, wherein there are multiple Latinx stores. Further, there is a stereotype that undocumented Latinx residents go there to purchase false legal documents such as I.D.s or driver's licenses.

36.     Officer Valadez referenced the Tropicana because he knew from the initial decision to stop Mr. Best that Mr. Best was a Latinx male.

37.     Upon information and belief, Officer Valadez and his DOE partner also ran his license plates before stopping him, which would have provided the officers with his information.

38.     Mr. Best had a real license issued by the DMV.

39.     Officer Valadez then demanded that Mr. Best raise his windows so that he could check to see what level of tint they had.

40.     Thereafter, Officer Valadez wrote a citation and demanded that Mr. Best exit the vehicle to sign it.

41.     Mr. Best was already concerned for his safety based on Defendant Valadez's aggressive demeanor and interrogation regarding what he was doing and gang involvement.

42.     Mr. Best asked if he could sign the citation from within his vehicle, but Defendant Valadez denied the request and ordered Mr. Best out of the vehicle. Defendant Valadez told Mr. Best that the citation was on the car's hood..

43.     Mr. Best then complied with Defendant Valadez's demand to exit the vehicle.

44.     After Mr. Best exited his vehicle, Defendant Valadez and his DOE officer partner violently grabbed him, jostled, grappled, and violently struck Mr. Best.

45.     Mr. Best was shocked, confused, terrified, and in utter disbelief about why the Defendants were using excessive force.

46.     Mr. Best had not struck or attempted to strike Defendant Valadez or his partner during the subject incident. Further, Mr. Best did not pose a threat to either Officer's safety and was not attempting to flee the scene.

47.     During the attack, Mr. Best honestly thought Defendant Valadez and his partner might kill him as he was punched and tased.

48.     After some time, additional officers arrived at the scene and assisted in arresting Mr. Best.

49.     Mr. Best was then transported to the emergency room at Santa Clara Valley Medical due to his severe injuries.

50.     Moreover, upon information and belief, Defendant Valadez and his DOE partner tore up Mr. Best's vehicle in an attempt to find drugs or any other illegal paraphernalia. None was found.

51.     Mr. Best was subjected to this disparate treatment because of his race as a Latinx male and not merely in spite of it.

52.     Upon information and belief, White citizens were also driving on the public streets of San Jose at the time that Mr. Best was illegally pulled over. Defendant Valadez could have easily chosen White citizens to detain unlawfully, racially profile, mock, strike, and tase. However, upon information and belief, Officer Valadez did not do so and chose to specifically unlawfully detain and racially profile Mr. Best.

53.     Per the United States Census, in 2021, the Latinx community represented 31% of the population in San Jose, CA, and the White community represented 37.5% of the population.

Thus both the Latinx and White communities were comprised of similarly situated individuals in comparable population sizes.

54.     Citizens from both the White and Latinx community engage in driving motor vehicles on the public streets of San Jose and did so at the time of the incident underlying this complaint.

55.     However, Latinx citizen drivers who are similarly situated to White drivers in San Jose are subjected to discriminatory treatment specifically because of their race and not merely in spite of it.

56.     Specifically, Latinx citizens are subjected to higher rates of excessive force, more likely to be pulled over while driving, curb sat, searched, and more likely to be taken to jail rather than the hospital after being injured than similarly situated White citizens.

57.     Further, Latinx citizens are 2.4 times more to be handcuffed by SJPD officers than similarly situated White citizens during traffic stops.

58.     Additionally, Latinx citizens are pulled over and searched more frequently than White citizens. For example, data from the first nine months of 2014 show that Latinx citizens made up 57% of the traffic stops as compared with being 33% of the population. It is also alleged that prior data shows that White citizens are slightly more likely to be actually carrying drugs or other contraband at rates of 16% for White citizens and 12% for Latinx citizens.

59.     Thus, White citizens who are and were similarly situated to Latinx citizens could have been subjected to similar discriminatory treatment, coercive stops, searches, temporary seizures, citations, and threatened arrests, but were not.

60.     The City of San Jose practices and follows a "gang suppression" policy driven by broken windows theory and or a variation of it and intentionally targets Latinx citizens with

discriminatory treatment. Further, Latinx citizens are treated as a class apart and stereotyped as more prone to violence and illegal activity by virtue of their race.

61.     Further, in 2015, Former SJPD police chief Larry Esquivel in his official capacity as Chief of Police, proclaimed in response to allegations of racial profiling by SJPD Officers that they were  attempting to "seek out criminal activity and be proactive" and  "focused on high crime areas such as East San Jose, which is heavily Latino." Former Chief Esquivel's comment showed a commitment to focusing on Latinx citizens.

62.     Former Chief Larry Esquivel also stated that there are "certain people who gravitate towards gangs" in reference to Latinx citizens. Thus, Chief Larry Esquivel admitted that Defendant CITY believes in a connection between crime and the Latinx community, which they intentionally had been and wanted to keep focusing on.

63.     Under the policy, Latinx citizens in San Jose are seen as more predisposed to crime based on their race by Defendant CITY. Thus Defendant CITY makes an intentional decision in its training, customs, and policies in who they pull over and subsequent disparate treatment of those Latinx citizens versus that of similarly situated White citizens.

64.     For several decades, the Defendant City of San Jose has discriminated against and viewed Latinx citizens with heightened suspicion and treated them differently than similarly situated Whites.

65.     Additionally, on 12/13/19, the City of San Jose invited Yale University History Professor Stephen Pitti to explain the history of discrimination in San Jose against Mexican-Americans and Latinx citizens to the city council. Specifically, Dr. Pitti indicated that economic growth in the early years of San Jose's existence as part of the United States was in

part pursued and motivated in the name of anti-native, anti-Mexican motives, anti-Catholic sentiments.

66.     Further, Dr. Pitti informed the San Jose City Council that the framers of the City of San Jose sent citizens of color, such as Latinx citizens and immigrants, to jail on vagrancy laws and turned them into indentured servants both before and after the civil war. Additionally, in the 19th century, systems of racial violence were perpetrated against Mexican-Americans, wherein lynchings were not uncommon roughly 150 years ago.

67.     Moreover, Mexican-Americans were also criminalized and labeled "monsters" and "tigers" in ways much like the coded language of "super predators," which was widely used in the 1990s against persons of color.

68.     Further, Dr. Pitti explained that Mexican-Americans faced severe disparate treatment in criminal proceedings in San Jose as opposed to similarly situated whites. For example, Mexican-Americans would frequently be sentenced to death in court trials for homicide as opposed to similarly situated whites who would only be charged with manslaughter and faced short prison terms.

69.     Additionally, Dr. Pitti stated that in the early 1900s, Mexican-Americans in San Jose faced segregation in housing and employment. For example, the City of San Jose passed laws saying that local government jobs could only go to United States citizens, which was a code for excluding Mexicans from jobs.

70.     Further, Dr. Pitti explained that due to racial covenants in housing sales and employment discrimination, Mexican-Americans were thus forced to live in areas of San Jose such as East San Jose, which in the early 1900s, the City of San Jose severely neglected.

Specifically, the City of San Jose failed and/or refused to pave the roads there, failed and/or refused to provide those citizens with sewage, and provided minimal fire services.

71.    Finally, Dr. Pitti referenced a 1982 United States Commission on Civil Rights wherein they reported that the City of San Jose was sharply divided on ethnic and sexual lines, with White males holding the positions with the highest income and power.

72.    Over the decades, Defendant City of San Jose has failed to adequately address the continued complaints of racial profiling of Latinx Citizens while driving or merely existing within the City. Defendant City has only claimed they would investigate the claims or objective statistics showing disparate treatment of Latinx citizens versus similarly situated Whites. Police chief after Police Chief and mayor after mayor have made similar claims they would investigate or expected racial profiling concerns to be fixed promptly.

73.    However, as noted by current San Jose Mayor Sam Liccardo in his public letter on 6/14/2019, "Fulfilling the Promise of the 14th Amendment: Our Next Steps to Enhancing Police Accountability in San Jose", "It seems unlikely that the American public will ever feel confident in a system of accountability which allows only the police to police themselves."

74.    Defendant CITY has selected and reaffirmed a particular course of action and policy to focus its "proactive" criminal investigations on Latinx citizens because of their race.

## DAMAGES

75.    As a proximate result of the Defendants' conduct, Mr. Best suffered pain and physical injuries, including but not limited to multiple contusions to his face, body, taser injury, and a broken screw in his leg.

76.    As a further proximate result of Defendant Valadez and his DOE partner's conduct, Mr.

Best suffered emotional distress, humiliation, embarrassment, and loss of his sense of

security, dignity, and pride.

77.    The conduct of Defendant Valadez was malicious, sadistic, wanton, and oppressive.

Mr. Best is therefore entitled to an award of punitive damages against Defendant Valadez, his

DOE partner, and Defendant CITY.


**CAUSES OF ACTION**

**First Cause of Action**

Violation of the Fourteenth Amendment and 42 U.S.C. §1983

Against Defendant VALADEZ and DOES 1-10

77.    The foregoing allegations are realleged and incorporated herein.

78.    Defendants, acting under color of law and in concert with one another, have engaged in

a continuing pattern and practice of intentional race discrimination against Latinx citizens in

pedestrian and traffic stops and subsequent investigations carried out throughout the city of San

Jose. In so doing, Defendants have caused the Plaintiff and others like him in the Latinx

community to suffer deprivation of fundamental rights to liberty and be free from unlawful

searches, detentions, and seizures on account of race and/or national origin. Specifically,

Plaintiff was subjected to these violations because he was a young Latinx male driving in San

Jose and treated differently than other groups based on his race and perceived national origin.

Specifically, Plaintiff and citizens within his racial group are subjected to differential treatment

and discriminated against as opposed to those in the racial group categorized as White or

Caucasian who were similarly situated.  These rights violated Plaintiff's rights to equal

protection of the laws, in violation of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. §1983.

79.     Defendants have over several years selected and reaffirmed the choice and decision to stop, investigate, and detain Latinx citizens specifically because of their race.

80.     Defendants acting under color of law, institute, authorize, tolerate, ratify, permit and acquiesce in policies, practices, and customs of detention, searches, and seizures that involve intentional race discrimination in the provision of law enforcement services.

81.     Defendant's acts were done in knowing violation of Plaintiff's legal and constitutional rights and have directly and proximately caused Plaintiff's humiliation, mental pain, and emotional distress.

**<u>Second Cause of Action</u>**

Violation of 42 U.S.C. §1981

Against all Defendants

82.     The foregoing allegations are realleged and incorporated herein.

83.     Plaintiff was unlawfully stopped without probable cause, unlawfully detained, and subjected to excessive force by Defendant Valadez solely because of his race.

84.     Defendants, acting under color of law and in concert with one another, have denied Plaintiff his rights to full and equal benefit of the law or proceedings for the security of persons under 42 U.S.C. §1981.

85.     Defendants' acts were the result of discriminatory intent and were done in known violation of Plaintiff's legal and constitutional rights, without good faith, and have directly caused Plaintiff's humiliation, mental pain, and emotional distress.

86.   Plaintiff was subjected to a criminal investigation.

87.   Plaintiff was discriminated against based on his race and perceived national origin and denied the equal benefit of all laws and proceedings for the security of his person as enjoyed by White citizens and subjected to disparate treatment.


### Third Cause of Action

Violation of Article 1, §7(a) of the California Constitution

Against all Defendants

88.   The foregoing allegations are realleged and incorporated herein.

89.   Mr. Best was subjected to disparate treatment due to his race and status as a Latinx male. Moreover, Mr. Best was stopped without probable cause and subjected to excessive force.

90.   Mr. Best was unfairly discriminated against and subjected to such adverse treatment based solely on his race as opposed to similarly situated whites.

91.   Defendants' above-described conduct violated Plaintiff's right not to be deprived of due process and equal protection of the laws under Article 1, § 7(a) of the California Constitution.


### Fourth Cause of Action

Violation of Article 1, § 13 of the California Constitution

Against all Defendants

92.   The foregoing allegations are realleged and incorporated herein.

93.   Defendant CITY, through Defendant Valadez, subjected Mr. Best to unreasonable search and seizure.

94.     Defendant Valadez stopped and unlawfully detained Mr. Best for allegedly having a non-working license plate light. Mr. Best explicitly denies that his license plate light was out before being stopped by Defendant Valadez.

95. Defendant Valadez and his DOE partner deprived Mr. Best of his freedom by subjecting him to unreasonable detention and detaining him without a warrant and reasonable or probable cause, all without his consent. Further, Mr. Best was subjected to an interrogation regarding drugs and gang membership based on his race.

96.     As a result of Defendant's actions, Mr. Best was harmed, and Defendant Valadez's actions were a substantial factor in causing that harm.

97.     Furthermore, there is a real and actual controversy between Plaintiff and Defendants regarding whether Defendant Valadez could undertake to act as described herein. Plaintiff contends that Defendant Valadez violated the United States and California Constitution and the United States and California laws. On information and belief, Defendant Valadez denies that his conduct violated the United States and California Constitutions and laws of the United States and California. Plaintiff fears he will again be subjected to such unlawful and unconstitutional actions and seeks a judicial declaration that Defendant Valadez and his DOE partner's conduct deprived Plaintiff of his rights under the United States and California Constitutions and the laws of the United States and California.

98.     Upon information and belief, Mr. Best had already been subjected to a similar style stop roughly six months before the subject incident by Defendant Valadez and his DOE partner.

98.     In addition, the Plaintiff is informed and believes and thereon alleges that, unless enjoined, Defendant Valadez will continue to engage in the unlawful acts and the policies and

practices described above, in violation of the legal and constitutional rights of the Plaintiff and others who are so similarly situated.

**Fifth Cause of Action**

Bane Act (Cal Civ. Code §52.1)

California Tort Claims Act, Cal. Gov't Code §§815.2, 820

Against Defendant Valadez, DOES 1-10

99.    The foregoing allegations are realleged and incorporated herein.

100.   Defendant City, through Defendant Valadez and DOES defendants, intentionally interfered with Mr. Best's exercise and enjoyment of his civil rights under the United States and California Constitutions.

101.   Defendant Valadez intentionally interfered with and showed a reckless disregard for Mr. Best's rights under the Fourth Amendment and Article I, Sections 10 and 13 of the California Constitution to be free from unlawful, unreasonably invasive, or prolonged investigatory detention in the absence of probable cause. Defendant Valadez used intimidation and coercion to prevent and/or attempt to prevent Mr. Best from insisting on his rights. Defendant Valadez and his DOE partner used excessive force and continued to unlawfully detain him in retaliation against Mr. Best.

102.   Defendant Valadez intentionally interfered with and showed a reckless disregard for Mr. Best's right to be free of unreasonable searches and seizures under the Fourth Amendment. Defendant Valadez used violence and physical force with Mr. Best to prevent him from exercising and enjoying his civil rights. Defendant Valadez subjected him to an

unreasonably invasive and prolonged investigatory detention, excessive force, and unlawful

detention to retaliate against him for invoking that right.

103.   Defendant Valadez intentionally interfered with and showed a reckless disregard for

Mr. Best's right under the Fourth Amendment and Article I, Section 13 of the California

Constitution to be free from unlawful detention without probable cause. Defendant used

threats and force to effect Mr. Best's unlawful detention. Mr. Best reasonably believed that

Defendant would commit violence against him if he did not physically submit to the unlawful

detention. For example, Defendant Valadez aggressively approached, spoke to, and mocked

Mr. Best before demanding he exit his vehicle to sign his citation for no understandable

reason. All of which made Plaintiff fear for his safety. Further, after complying with

Defendant Valadez's order that he exit the vehicle, Defendant Valadez and his DOE officer

partner used excessive force. They violently attacked Mr. Best by grappling him, striking him,

and tasing him even though Mr. Best did not pose a threat to the safety of either officer and

never attempted to strike either officer.

104.   As a direct and proximate result of Defendant Valadez's violation of California Civil

Code §52.1 and the Plaintiff's rights under the United States Constitution and the laws of the

Constitution of the State of California, Plaintiff was harmed.  Plaintiff sustained injuries and

damages, and Defendant Valadez's conduct was a substantial factor in causing Plaintiff's

harm. Additionally, against Defendant Valadez, the Plaintiff is entitled to relief as set forth

above in paragraphs contained herein, including punitive damages against the Defendant in

his individual capacity, including all damages and penalties allowed by California Civil Code

§§52, 52.1, and California law, including costs, attorneys fees, civil penalties, and punitive

damages. Further, Defendant's violations of Plaintiff's rights as guaranteed by the California

Civil Code (§52.1) entitled Plaintiff to compensatory and punitive damages, treble damages, as well as attorneys fees, all of which are provided for in the California Civil Code §§52, et seq., and are requested herein.

105.  Since the conduct of Defendant Valadez occurred in the course and scope of their employment, Defendant CITY is therefore liable to Plaintiff pursuant to respondeat superior.

## Sixth Cause of Action

Battery (Cal. Govt. Code §820 and California Common Law)

By Plaintiff against Defendant CITY and Defendant Valadez and DOES 1-10

106.  The foregoing allegations are realleged and incorporated herein.

107.   Defendant Valadez and his DOE officer partner, while working as officers for the San Jose Police Department, and acting within the course and scope of their duties, intentionally and unlawfully stopped, detained, and used force on Plaintiff without probable cause. Defendant Valadez and his partner grappled with, struck, and tased Mr. Best even though he did not and never posed a threat to either officer's safety and never attempted to strike either officer.

Even after Mr. Best informed Defendants that he was not resisting, Defendant Valdez and his partner continued to use excessive force and caused severe injury and emotional distress. During the attack, Mr. Best was in obvious distress and physical pain, yet Defendant Valadez and his partner continued to use excessive and unreasonable force. As a result of the actions of Defendant Valadez and his partner, Plaintiff endured severe pain and suffering, and emotional distress. Defendant Valadez and his partner had no legal justification for using force against the Plaintiff and said Defendant's use of force while carrying out his duties as a

San Jose Police Officer was an excessive and unreasonable use of force, particularly because the Plaintiff was unarmed and did not pose an immediate threat to the life of any individual, including any officer.

108.   As a direct and proximate result of the conduct of Defendant Valadez and his partner as alleged above, Plaintiff suffered emotional distress and physical pain.

109. Defendant CITY is vicariously liable for the wrongful acts of Defendant Valadez and his partner under section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject them to liability.


**Seventh Cause of Action**

Fourth Amendment (42 U.S.C. §1983)

Against Defendants Valadez and DOES 1-10

110.   The foregoing allegations are realleged and incorporated herein.

111.   Defendant Valadez and his partner caused Plaintiff to be detained as he attempted to arrest Mr. Best in violation of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Mr. Best under the Fourth Amendment of the United States Constitution and applied to state actors by the Fourteenth Amendment.

112.   As a result of the conduct of Defendant Valadez and his partner, he is liable for Plaintiff's injuries because they were integral participants in the violations of Mr. Best's rights.

113.   Plaintiff was detained without reasonable suspicion by Defendant Valadez and his partner as they unlawfully detained Mr. Best without probable cause, as Mr. Best's license plate light was in working order before being stopped.

114.   The conduct of Defendants Valadez and his partner was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff and thus warrants the imposition of exemplary and punitive damages as to Defendants Valadez and his partner.

115.   Accordingly, Defendants Valadez and his partner are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. §1983.

116.   Plaintiff also seeks attorney fees under this claim.

**Eighth Cause of Action**

Unreasonable Search and Seizure—Excessive Force (42 U.S.C. § 1983)

By Plaintiff against Defendants Valadez and DOES 1-10

117.   The foregoing allegations are realleged and incorporated herein.

118.   Defendant Valadez and his partner's unreasonable use of excessive force deprived Mr. Best of his right to be secure in his persons and property against unreasonable searches and seizures as guaranteed to Plaintiff under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

119.   As a result, Plaintiff suffered physical pain and emotional distress.

120.   As a result of the conduct of Defendant Valadez and his partner, he is liable for Mr. Best's injuries because he was an integral participant in the excessive force. Specifically, Defendant Valadez and his partner used excessive force while grappling, striking, and tasing him.

121.   The use of excessive force was unreasonable under the circumstances. Thus, Defendant Valadez and his partner deprived Mr. Best of his right to be free from unreasonable searches and seizures under the Fourth Amendment and applied to state actors by the Fourteenth Amendment.

122.   The conduct of Defendants Valadez and his partner was willful, wanton, malicious, and done with reckless disregard for the rights and safety of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages as to Defendants Valadez and his partner.

123.   Plaintiff also seeks attorney fees under this claim.

### Ninth Cause of Action

Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. §1983)

By Plaintiff Against Defendant CITY

124.   The foregoing allegations are realleged and incorporated herein.

125.   While acting under the color of state law and within the course and scope of their employment as police officers for the Defendant CITY police department, Defendant Valadez's use of excessive force, unlawful detention, and racial profiling/discrimination deprived Mr. Best of his rights and liberties secured to him by the Fourth and Fourteenth Amendments, including his right to be free from unreasonable search and seizure and equal treatment under the law.

126.   Upon information and belief, Defendants Valadez and his partner acted pursuant to an expressly adopted official policy or longstanding practice or custom of the Defendant CITY.

127.   Upon information and belief, Defendants Valadez and his partner were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with the detention, excessive force, and racial profiling/discrimination based on the Plaintiff's race.

128.   Defendants deprived Mr. Best of the rights and liberties secured to him by the Fourth Amendment and Fourteenth Amendment to the United States Constitution, in that said Defendants and their supervising and managerial employees, agents, and representatives acted with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general. Plaintiff, and persons in their class, situation, and comparable position in particular, knowingly maintained, enforced, and applied an official recognized custom, policy, and practice of:

(a) Employing and retaining as police officers and other personnel, including Defendants Valadez and his partner, at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens by failing to follow written CITY Police Department Policies;

(b) Of inadequately supervising, training, controlling, assigning, and disciplining CITY Police Officers and other personnel, whom Defendant CITY knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

(c) By failing to adequately train officers, including Defendants Valadez, and failing to institute appropriate policies regarding the use of excessive force and unreasonable searches and seizures; reasonable accommodations for citizens with physical injuries, and

(d) By having and maintaining an unconstitutional policy, custom, and practice of using excessive force, racial profiling, and targeting citizens of Latinx descent, demonstrated by inadequate training regarding these subjects. The policies, customs, and practices of Defendant CITY were done with deliberate indifference to individuals' safety and rights, and

(e) By failing to adequately discipline CITY police officers for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be

out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

(f) Maintaining a policy of inaction and an attitude of indifference towards citizen complaints of excessive force and false arrests/unlawful detentions, and racial profiling, including by failing to discipline, retrain, investigate, terminate, and recommend officers for criminal prosecution who participate in the use of false arrests/unlawful detention, excessive force, and racial profiling.

(g) Failing to institute or adequately address inherent problems with the CITY's police officers' disparate treatment, unlawful detentions, arrests, racial profiling, and use of force on citizens of Latinx descent. Specifically, by and through its Police Officers, Defendant CITY discriminates against citizens of Latinx descent.

129.   By reason of Defendants' aforementioned policies and practices, Plaintiff was injured and subjected to pain, suffering, and emotional distress.

130.   Defendant CITY and various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices, and customs alleged in the paragraphs above. Despite knowing, as stated above, these Defendants condoned, tolerated, and through actions and inactions, thereby ratified such policies. Said Defendant's also acted with deliberate indifference to the foreseeable effects and consequences of these policies concerning Plaintiff's constitutional rights and other individuals similarly situated.

131.   By perpetrating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendant CITY acted with an intentional, reckless, and callous disregard for Plaintiff's health and constitutional rights. Defendants' actions were willful, wanton,

oppressive, malicious, fraudulent, extremely offensive, and unconscionable to any person of normal sensibilities.

132.   Specifically, Defendant CITY'S gang suppression policy and the training provided to its authorized agent officers are the force behind the constitutional violations against Plaintiff and others within the Latinx community.

133.   For example, the Violent Crimes Enforcement Team and Metro Unit of the San Jose Police Department have specifically noted that they proactively engage in traffic and pedestrian stop with an interest in uncovering criminal activity.  (San Jose Police Department Traffic and Pedestrian Study, by Michael R. Smith, J.D., Ph.D., Jeff Rojekm Ph.D., University of Texas at El Pasto Center for law and human behavior, January 18, 2017, pg 106)

135.   Defendant CITY'S gang suppression policy is based upon broken windows theory and or a variation of it wherein officers heavily patrol and police Latinx citizens in San Jose with the intention of "reducing crime" by subjecting Latinx citizens to significantly higher levels of traffic stops, pat-downs, searches, curb seating, gang relation interrogations, photographing of Latinx bodies/faces to catalog them, handcuffing, and threats and actual use of force.

136.    The aforementioned unconstitutional customs, practices, and policies, in addition to the ratification of the deficient customs, practices, and policies, are evidenced by objective studies showing that Defendant CITY, by and through its Officers, uses force and arrests citizens of Latinx descent at a rate disproportionately higher than it does White citizens. As well as numerous local news articles calling out Defendant CITY'S discriminatory practices.

137.   Furthermore, Defendants' policies, practices, and customs implemented and maintained and still tolerated were affirmatively linked to and were a significantly influential force

behind Plaintiff's injuries. Prominent examples of objective evidence, statements from the SJPD, statements from the San Jose Independent Police Auditor, statements by current or former SJPD officers, and media articles regarding similar practices are as follows:

I.) Data collected and distributed by the San Jose Police Department from January 2015- to 2019 indicates 290 use of force incidents wherein obstruction of justice was the most serious crime charged. San Jose Police Department; Https://www.sjpd.org/records/crime-stats-maps/force-analysis- data)  Further, 165 of those individuals arrested were injured, amounting to a 57% injury rate. (Id.)

Injuries ranged from broken bones, canine bites, chemical irritation, cuts/punctures/blood, and bruises/scrapes. (Id.) Moreover, when these arrests were broken down even further, the citizens most likely to suffer from the use of force when the most serious charge was obstructing justice were Male (84%), Latino (55%), and under 39 years of age (62%), all of which perfectly describe the Plaintiff

II.) Former Independent Police Auditor Aaron Zisser expressed concerns about how Whites had safer interactions with police than minorities, including Latinx citizens. Specifically, "In a review of more than 100 cases from 2015 to 2017, officers were more likely to take white suspects to the hospital and their minority counterparts to jail in use-of-force cases when no charges are filed." (San Jose Inside, by Jennifer Wadsworth, More SJPD Officers disciplined despite fewer Citizen Complaints, May 21, 2018).

Further, Mr. Zisser also "pointed to an independent study from the University of Texas, El Paso in 2017, which showed San Jose police officers were 2.4 times more likely to handcuff Latino

residents than white people during a traffic stop." (San Jose Spotlight, by Mauricio La Plante, "How do you fix San Jose Police troubles? Two former police watchdogs weigh in," July 11, 2020)

III.)    Additionally, previous Independent Police Auditor and retired Judge, Hon. Ladoris Cordell (Ret.) stated regarding recent issues in 2020 that the "department's recent scandals point to a larger problem of systemic racism. She also indicated that Mayor Sam Liccardo and Police Chief Eddie Garcia have yet to explicitly identify that problem. (San Jose Spotlight, by Mauricio La Plante, "How do you fix San Jose Police troubles? Two former police watchdogs weigh in" July 11, 2020)

IV.)    Moreover, a report by the Mercury News in 2015 detailed how San Jose Police department officers "pull over, searched, curb-sat, cuffed or otherwise detained Blacks and Latinos least year at far higher percentages than their share of this city's population, an analysis of traffic-stop data by this newspaper found. Yet the stops seldom led to arrests or evidence of crimes." (SJPD date show San Jose Cops detained greater percentage of Blacks, Latinos by Robert Salonga, Tracey Kaplan, and Leigh Poitnger, 5/9/2015, San Jose Mercury News)

In response to the troubling statistics, then chief Larry Esquivel used the common claim and language of policing that they were focusing on "high-crime areas such as East San Jose, which is heavily Latino." Chief Esquivel further stated, "gang activity has been a huge focus. Within that, there are more certain areas or people who gravitate toward gangs."

Specifically, the Mercury News highlighted that in the first nine months of 2014, Latinos made up 57% of the traffic stops compared with being 33% of the population. Additionally, once

stopped, Latinos were significantly more likely to be ordered out of their vehicles, frisked, and have their cars searched; more than three-quarters of those subjected to such treatment by San Jose police were Black or Latino. Only 6 percent of those stopped were arrested, including 3 percent of Asians, 5 percent of whites, and 7 percent of blacks and Latinos. While few searches of those stopped turned up evidence, whites were slightly more likely to be carrying drugs or other contraband (16 percent) than Latinos (12 percent) and blacks (14 percent). (Id.)

V.)     In 2009, a Mercury News investigation revealed the Latinx community was being arrested for conduct crimes at far higher rates than in other large cities around the state. Specifically, at the time, San Jose's population was less than 1/3 Latinx, about 57% of those charged by San Jose Police with resisting arrest, and more than 70% of those charged with disturbing the peace were Latinx. (Policing in San Jose: Strict enforcement of 'conduct crimes'; are Latinos targeted? By Sean Webby, 4/9/2009, San Jose Mercury News) Further, the article featured an analysis of the data by Shaun Gabbidon, a Pennsylvania State University Criminologist who has focused his career on studying race in crime and policing. Mr. Gabbidon stated:

> "The situation in San Jose has all the makings of racial profiling," said Shaun Gabbidon, a Pennsylvania State University criminologist who has focused his career on studying race in crime and policing."

> "Are Hispanics getting differential treatment because they are perceived as a threat?" Gabbidon asked. "Because of an overexaggerated fear of Hispanics, the police might be overreacting to situations that do not warrant formal police action." (Id.)

VI.)     Additionally, an investigation by The Mercury News reported in 2007 that San Jose police were more likely to use force against Blacks and Latinx citizens than against criminal suspects from other ethnic groups. ("San Jose Police more likely to use force against blacks, latinos" by Rodney Foo and Sean Webby, 03/21/2007, The San Jose Mercury News)

VII. )   Further, Defendant City and the Police Department have made claims attempting to justify or explain away allegations of racial profiling and explain why Latinos have been arrested or stopped at higher rates. In 2008, in response to claims that Defendant City was arresting Latinx citizens at higher rates for public drunkenness than other similar-sized cities. Defendant City claimed that the majority of the arrests of Latinx citizens were from out of town and were Latinx who were "flooding" downtown. ("Statistics contradict San Jose Police on Public-Drunkenness Arrests" by Sean Webby, 12/18/2008, The San Jose Mercury News)

However, the data revealed that the majority of people arrested downtown for public drunkenness were not Latinx and that most Latinx citizens were arrested outside downtown than in its city core. (Id.) Further, the data showed that the majority of those Latinx citizens who were arrested for being "dangerously drunk" downtown were from San Jose. (Id.) In response, then-mayor Chuck Reed stated, "It's pretty clear to me that we have some problems that need to be fixed…if the police department is making attitude arrests or they are racially profiling, I expect the Chief to remedy those things." (Id.) When asked if he believed there was racial profiling, mayor Chuck Reed also stated, "It might be happening. We have anecdotal evidence."

XIII.) Further, in 1999, a study found that the San Jose Police department was stopping Latinx drivers at a disproportionate rate to their total population. Specifically, Latinx drivers were 31% of the population but represented 43% of the people stopped. ("Police and Community React to

San Jose Traffic Stop Data", 12/18/1999, ACLU, https://www.aclu.org/press-releases/police-and-community-react-san-jose-traffic-stop-data.)

XIV.) Finally, Defendant CITY has a long history of using coded language that is not overtly racist or discriminatory in oppressing, excluding, and discriminating against minority communities. Such language is more subtle and does not involve direct racial slurs. Instead, it focuses on generalized terms that still affect and discriminate against minority communities, including the Latinx community, without explicitly saying so. For example, addressing "high-crime areas" is a common refrain. These concepts then become catch-all terms to explain away discrimination without addressing the bias within the disparity in arrests.

A perfect and prominent example is the recent apology by Defendant CITY of San Jose to the Chinese American community for its involvement, discrimination, oppression, and failure to prevent the burning down of San Jose's China Town in 1887. ("Tremendous Feeling of Justice as San Jose Apologizes for Discrimination" by Natasha Chen, https://www.cnn.com/2021/10/01/us/san-jose-racism-apology-chinese/index.html) As an example, a declaration passed by Defendant CITY in 1887 proclaimed the China Town to be:

> "A public nuisance, injurious to private property adjacent thereto, dangerous to the public health and welfare all citizens who live and have homes in its vicinity, and a standing menace to both public and private morals, peace, quiet and good order, and etc."(Id.)

What is important to note is the lack of direct racial slurs or overt racism. The declaration's language was framed in terms of alleged public health and the welfare of the general community. Additionally, Mayor Sam Liccardo ended the apology to the Chinese American community by acknowledging a history of violence against other minority groups, including the Latinx

community. ("San Jose apologizes to Chinese American community for a 'century of discriminatory actions'" by Catherine Thorbecke, 9/30/21, https://abcnews.go.com/US/san-jose-apologizes-chinese-american-community-century-discriminatory/story?id=80325638)

XV.) Defendant CITY has also been accused of discriminatory treatment against the Latinx community by the SJPD for several decades. Defendants CITY'S blatant mistreatment and police brutality against Latinx members, particularly youth living in East San Jose, led to Latinx citizens creating the first documented community alert patrols in 1972 wherein volunteer cohorts equipped with two-way radios and scanners would go to where police were dispatched and document any abuses. The community members would jot down officer names, badge numbers, and take photos of those who might be arrested to document subsequent police brutality. At one point, the number of volunteers numbered over 1,000 going out to patrol police. (Mexican Americans in Search of Justice and Power, the Struggle for Citizenship Rights in San Jose, California, Francisco Jimenez, Alma M. Garcia, and Richard Garcia, 2007)

XVI.) Further, in 1999, former SJPD Chief William Lansdowne publicly stated that even his own minority officers within the SJPD were reporting to him that SJPD officers were stopping motorists solely based on the color of their skin. (https://www.aclu.org/press-releases/police-and-community-react-san-jose-traffic-stop-data)

138.    Former San Jose Police Chief Joseph Mcnamara also admitted that broken windows theory has tended to create an enemy class in the minds of many officers. (George Kelling, whose "broken windows" theory revolutionized urban policing, dies at 83", Jill Leovy, May 16, 2019,  Los Angeles Times)

139.    In the instant case, Latinx citizens become the enemy class to San Jose Police Officers. They are then unfairly seen by the officers as predisposed to violence, drug use, gang activity, and criminal activity.

140.   The aforementioned policy, practices, and pattern were the moving force behind the constitutional violations suffered by Plaintiff.

141.   By reason of Defendant's aforementioned acts and omission, Plaintiff suffered physical pain and emotional distress.

142.   Accordingly, Defendant is liable to Plaintiff for compensatory damages under 42 U.S.C. §1983.

143.   Plaintiff seeks attorney fees under this claim.

### Tenth Cause of Action

Intentional Infliction of Emotional Distress

Against All Defendants

144.   The foregoing allegations are realleged and incorporated herein.

145.    By and through its employees and authorized agent Valadez and his DOE partner, Defendant CITY discriminated against Mr. Best.

146.    The conduct of Defendant Valadez and his DOE partner was outrageous and was intentional and or done with reckless disregard that Mr. Best would suffer harm and emotional distress. Specifically, Mr. Best was unlawfully detained without probable cause, was aggressively approached by Defendant Valadez, mocked, and interrogated about gang affiliations based on his race and perceived national origin. Plaintiff was also subjected to excessive force when he was ordered out of his vehicle under the pre-text of signing a citation.

As a result, Mr. Best was forced to feel like a second-class citizen and effectively treated by Defendant as a class apart.

147.   Defendant Valadez's actions on the date of the incident were motivated by policies and customs of the San Jose Police department and Defendant City. Specifically, the broken windows policy or variation of it that Defendant City employs has particular intentional aims. Specifically, the goal is to focus on minor issues such as graffiti, jaywalking, driving with a broken license plate light, loitering, etc., and then arrest on those alleged charges and or investigate the person's detained with the hope of uncovering any other form of illegal activity to arrest that individual on. This type of policing overwhelmingly focuses on specific low-income areas and persons of color.

148.   An additional aim/goal of that policy is for the person who is stopped and others who see that person being detained by the police to "think twice" before breaking the law by striking fear into the general community by show of force. In essence, the officers show the other citizens that we can do this to them and you. They intentionally strike fear into the detainee and the other citizens living in the same area.

149.   Thus, Defendant Valadez and his DOE partner intentionally acted in the unlawful detention and racially motivated stop of Mr. Best. Defendant Valadez wanted Mr. Best to remember that stop and for that memory to stay with him over time. Defendant Valadez and his DOE partner wanted Mr. Best to live with the feelings of degradation and shame of being pulled over for no reason because they could, being questioned about gang activity, mocking him with accusations of fake IDs because of his race, and excessive force.

150.   As a result of excessive force, unlawful detention, and racial discrimination, Mr. Best has suffered severe emotional distress. As a result, Mr. Best has significantly limited his time

driving in San Jose out of fear of being targeted by Defendant Valadez, his DOE partner, or other SJPD officers. As an example, Mr. Best will now often use rideshare services when traveling in San Jose in the hopes it helps keep him slightly safer.

151.    Plaintiff suffered severe emotional distress, and the conduct of Defendant Valadez and his DOE partner was a substantial factor in causing Plaintiff's harm and severe emotional distress.

**Eleventh Cause of Action**

Violation of the Ralph Act, Civil Code 51.7

Against All Defendants

152.   The foregoing allegations are realleged and incorporated herein.

153.    Defendant CITY, by and through its employee and authorized agent Defendant Valadez and his DOE partner, discriminated against Mr. Best. A substantial motivating reason for this treatment was based on his race and perceived national origin.

154.    The conduct of Defendant Valadez and his DOE partner was outrageous and was intentional and or done with reckless disregard that Mr. Best would suffer harm and emotional distress. Specifically, Mr. Best was unlawfully detained without probable cause, was aggressively approached by Defendant Valadez, interrogated him about gang affiliations based on his race and perceived national origin, mocked him based on his race, and subjected him to excessive force.

155.   Specifically, Mr. Best verbally indicated he was not resisting arrest and showed obvious signs of physical distress and pain while the Defendants grappled, struck, and tasered him.  Mr. Best never posed a threat to the safety of either Defendant. Still, the Defendants intentionally chose to continue to use the same level of aggression and violence against Mr.

Best because they viewed him as a Latinx criminal who was not to be believed, trusted, or respected.

156. When Mr. Best asked Defendant Valadez if he could sign the citation from the safety of his vehicle, Defendants Valadez and his DOE partner could have complied and allowed Mr. Best to challenge the citation in court. However, Defendant Valadez and his DOE partner intentionally chose to demand that he exit his vehicle and then subjected him to excessive force.

157.    Plaintiff suffered severe emotional distress, and the conduct of Defendant Valadez and his DOE partner was a substantial factor in causing Plaintiff's harm and severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.) Award Plaintiff general, special, and compensatory damages in an amount to be proven at trial.

2.) Award Plaintiff punitive damages against the individually named Defendant and for their extreme, outrageous conduct in complete disregard for Plaintiff's rights.

3.) For actual damages, civil penalties, and attorneys fees under CA civil Codes §52, §52.1, §57.1

4.) Award Plaintiff statutory damages and/or attorney's fees against all Defendants as allowed by 42. U.S.C. §1988.

5.) All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42. U.S.C. §1983 and §12205, Cal. Code Civ. Proc. §1201.5, and as otherwise may be allowed by California and/or Federal law;

6.) Issue a declaratory judgment that Defendants' conduct as complained herein was a violation of Plaintiff's rights under the United States and California Constitutions and the Laws of the United States and California;

7.) Injunctive relief, including but not limited to the following:

    a. An order prohibiting Defendants and their law enforcement officers from unlawfully interfering with the rights of Plaintiff and others to be free from unreasonable searches and seizures and excessive and unreasonable force;

    b. An order requiring Defendants to institute and enforce appropriate and lawful policies and procedures for stopping and detaining individuals, particularly persons of color and/or Latinx descent;

    c. An order requiring Defendants to train their law enforcement officers concerning racial profiling of Latinx citizens and other communities of color.

    d. An order requiring Defendants not to single out Latinx citizens for interrogations regarding gang affiliations or drug use/possession based on their skin color/race/perceived national origin.

8.) Grant Plaintiff such other and further relief as the Court deems just and proper.

Dated: 5/25/22                      Law Office of Gustavo Magaña

                                   __/s/ Gustavo Magaña____

                                   Attorney for Plaintiff

JURY DEMAND: Plaintiff demands a trial by jury in this matter, pursuant to FRCP 38(a).

Law Office of Gustavo Magaña

Dated: 5/25/22                                          /s/ Gustavo Magaña

Attorney for Plaintiff